## City of Chicago v. Walter Bullis.
## Gen. No. 13,539.

1. CIVIL SERVICE ACT—*when appointee under, entitled to recover compensation.* An officer who is an appointee under the Civil Service Act, who has been wrongfully discharged, may, upon the discharge proceedings being quashed, recover his salary for the period during which he was so illegally kept from performing his duties, and this notwithstanding the pendency of new charges predicated upon the same matter which founded the basis of the original charges, the quashing of which original charge was because of irregularity in proceedings.

2. CIVIL SERVICE ACT—*distinction between office and employment*. The distinction between an office and employment, so far as the right to compensation goes, is that under the former the recovery of compensation may be had regardless of efforts to earn in other lines of occupation during a period of illegal deprivation of tenure.

3. CIVIL SERVICE ACT—*what essential to recovery of compensation annexed to office*. In order to recover compensation annexed to an office by one who has been illegally deprived thereof, it is essential that proof of legal right to such office be made; proof of *de facto* right is not sufficient.

4. CIVIL SERVICE ACT—*what office and not employment*. The position of patrolman in the city of Chicago is an office, and not an employment.

5. ORDINANCE—*what competent in proof of*. An ordinance may be proven by the introduction of a pamphlet containing the same, purporting to be published by authority, notwithstanding such pamphlet contains matter other than ordinances.

6. ORDINANCE—*when objection to manner of proof of, insufficient*. An objection to the manner of proving an ordinance must be specific in order to avail.

7. STATUTORY LAW—*what does not effect repeal*. Where there is apparent no conflict or intention to supersede, a re-enactment of an earlier statute has been held a continuance, not a repeal, even though a later act expressly repeals the earlier.

Assumpsit. Appeal from the Superior Court of Cook county; the Hon. ALBERT C. BARNES, Judge, presiding. Heard in this court at the March term, 1907. Affirmed. Opinion filed January 13, 1908.

MICHAEL F. SULLIVAN, CLYDE L. DAY and GEORGE W. MILLER, for appellant; EDWARD J. BRUNDAGE, of counsel.

A. D. GASH, for appellee.

MR. JUSTICE BROWN delivered the opinion of the court.

This is an appeal from a judgment of the Superior Court of Cook county against the city of Chicago in favor of Walter Bullis, the appellee, for $2,660.20, which was an amount sued for and recovered by Bullis as pay or salary as a patrolman of the city of Chicago, which had not been paid him. Bullis, it is admitted, held the position of patrolman in the police depart-

ment of the city of Chicago, under the classified civil service from April 14, 1898, to November 1, 1903. On this last date he was suspended by the head of the police department. After a hearing on charges brought against him before the Civil Service Commissioners he was found guilty by the Police Trial Board and his dismissal from the police department ordered. This finding and decision was approved by the Civil Service Commission. Bullis secured a writ of *certiorari* from the Superior Court of Cook county to the Civil Service Commissioners, and the Superior Court on the return of the Civil Service Commissioners quashed the same and ordered that the proceedings of the Police Trial Board and the Civil Service Commissioners in and about the discharge be held for naught. The Civil Service Commissioners and the city of Chicago appealed to this court, where the judgment of the Superior Court was affirmed. City of Chicago v. Bullis, 124 Ill. App. 7. In the opinion in that case the court says (quoting from People v. Kipley, 171 Ill. 44) : " 'An office is a mere right to exercise a public function or employment.' Such is the very right involved in this case. \* \* \* A patrolman legally in office has the right to remain in it while it exists so long as he conducts himself properly and is capable of discharging and does discharge efficiently and faithfully the duties of the office and until he arrives at the age limit, if there be one, and while he so remains he is entitled to the salary attached to the office. 'Offices, which are a right to exercise a public or private employment and to take the fees and emoluments thereunto belonging,' etc. 2 Blackstone's Com. 36." The court upholds the decision of the Superior Court on the ground that no notice was shown by the return to have been given appellee of the time and place of trial, and that whether or not Bullis could have been legally tried without such notice, in the absence of a rule of the Civil Service Commission requiring it, he could not be so tried in the face of the valid rule which existed and did require it.

From the decision of this court the Civil Service Commissioners and the city of Chicago appealed to the Supreme Court, which again affirmed the judgment. Powell et al. v. Bullis, 221 Ill. 379. The Supreme Court noticed the contention that as the "right of Bullis to hold the office of policeman" was not a property but a personal right, the Superior Court had no right to issue the writ and rejected it as untenable. It sustained the judgment of the Superior Court on the same ground taken by the Appellate Court.

June 1, 1906, Bullis was restored to duty. Charges under date of July 24, 1906, were again made against him before the Civil Service Commission, by the Chief of Police, who had been changed since the charges of 1903.

This suit was brought June 19, 1906, before the said charges of 1906 were filed, but at the time of the trial of this cause in the Superior Court in January, 1907, they were pending and undisposed of before the Civil Service Commission.

The present suit was for the salary of Bullis as patrolman of the city of Chicago from November 1, 1903, to June 1, 1906, which had not been paid him on account of his attempted discharge.

The cause was submitted to the court without a jury, and the court found in favor of the plaintiff for $2,660.20. From that judgment this appeal was taken, and it is here assigned for error that the court below erred in refusing a motion made during the trial to dismiss the action as prematurely brought, on the ground that the charges of·1903 against the plaintiff had never been disposed of before the Civil Service Commission, and having been refiled with additional specifications in 1906, were pending and undisposed of when the present suit was tried. It was contended that if thereafter plaintiff should be ordered discharged by the Civil Service Commission, such discharge would date back to the time of his first suspension in 1903. The denial of another motion to continue

the trial of the present cause for the same reason was also denied, and this also is claimed to be erroneous. The view of the law by the trial judge which resulted in his denial of these motions also caused him to exclude from evidence the said charges and proceedings of 1906, and to refuse to hold as a proposition of law applicable to this case that "If the charges preferred against the plaintiffs by the general superintendent of police are still pending and undetermined, and have been partially heard by the Civil Service Commission, then this action has been prematurely brought." These rulings, therefore, are also charged to be erroneous.

It is also, under the assignments of error, argued by the appellant that the position of police patrolman is not an office and a patrolman is not an officer, but that the position is a mere employment, and the person holding it a mere employe, and that consequently he is not entitled to his salary while unemployed for the city, or that at least the court erred in so applying the rule of law that the title to an office carries with it the right to the salary, as to exclude as immaterial and not tending to reduce the damages, evidence that during the time of his enforced separation from his duties as a policeman the plaintiff received from other employers compensation for services.

It is also argued that even if the position of police patrolman is an office and not a mere employment, it was incumbent on the plaintiff, before he could recover in this case, strictly to prove that he was an occupant of the office *de jure* and not merely *de facto,* and that this he failed to do. He did not show by the proof offered, it is said, either that the office filled by him had been legally created, or that he had been legally appointed thereto. Moreover, various parts of the documentary proof that was offered and admitted in evidence, it is insisted, were improperly admitted. It is claimed that they wanted the necessary

authentication. It is further urged that the judgment is excessive by the amount of one month's pay.

This last objection to the judgment is plainly based on a misapprehension or misconception. There is no denial that the pay for thirty-one months was withheld from Bullis, nor that the salary attached to the office was at the rate of $91.66 a month. Computation shows that even if, as contended by the appellant, one month's pay was in any event, through an authorized suspension of thirty days, forfeited by appellee, which it is not necessary for us to decide, the finding is below the salary unpaid him.

Nor do we think that the position in regard to the dismissal or continuance of the suit taken by the appellant is tenable.

The charges of 1903 against Bullis were carried to their full conclusion by the Civil Service Commission, and the entire proceedings, including the order of discharge, were quashed and held for naught by the Superior Court by a judgment afterward affirmed by the Appellate and Supreme Courts. That ended those proceedings altogether. It does not matter what reason was given to justify the judgment quashing the return and proceedings by any one of the three courts. The judgment was a final one as to those proceedings, and was so regarded by the city and the police department, for the appellant was put back at his work on June 1, 1906, and an entirely new proceeding was begun nearly two months afterward by filing with the Civil Service Commissioners and serving him with a new document signed by the new Chief of Police, setting forth the charges preferred against him. This suit had then been pending for a month. We think the trial court was right in holding the whole matter immaterial, excluding from evidence the record of the pending proceedings before the Civil Service Commission and denying the motions recited.

We do not regard the rulings on the admission of various pieces of documentary evidence offered by the

plaintiff erroneous. Specific objection in argument in this court is made that one ordinance introduced from the "Council Proceedings," with a title page and heading, "Published by authority of the City Council of the City of Chicago—Official Report," with a *facsimile* of the city clerk's signature, was not properly authenticated, and that section 65 of the Cities and Villages Act, which provides that when ordinances are printed in book or pamphlet form,. purporting to be published by authority of the board of trustees or the city council, such book or pamphlet shall be received as evidence of the passage and legal publication of such ordinances as of the date mentioned in such book or pamphlet in all courts and places without further proof, does not apply; and counsel state that specific objection was made to the same effect in the court below. We do not so read the record. Before this ordinance was offered, other ordinances, which were finally ruled out, offered from "council proceedings" which did not show or recite that they were published by the authority of the city council, had been objected to by counsel for the city (for example, see Rec. pages 37 and 38), but it seems to us from the record, the transcript of which is, however, obscurely and carelessly made up, with many evident errors in stenographic transcription, that counsel had admitted that where the pamphlet or report contained the heading, "Published by authority of the City Council of Chicago," it was admissible. (Rec. page 40.) In this condition of the objections this colloquy between counsel and court occurred:

"Mr. Gash (Counsel for plaintiff): Now, I offer ordinance passed January 20, 1902, Council proceedings 1901-1902, p. 1877, classifying patrolmen. I offer the title page of that book and the heading, 'Published by Authority of the City Council of the City of Chicago, Official Report, and the Clerk's signature— fac simile of the Clerk's signature.

The Court: Let me see that ordinance. Is there any objection to this?

Mr. Sullivan (counsel for defendant): The same objection. If it is ordered published as counsel states,—

The Court: I know, but is there any objection to it now?

Mr. Sullivan: No.

The Court: Well it will be received. No objection.''

Despite the ambiguity of this, it seems to us that the whole tenor of the dialogue leading up to this shows that it means that as to this ordinance no objection was made *after* counsel for the city had assured himself that the pamphlet did purport to be published by authority of the city council, and that not only was no specific objection made to its admission, but that all objection was waived, although the next page contains an exception to the action of the court in admitting it. But in any event we think it fell under the provision of section 65 of the City and Village Act mentioned, and was properly admitted. And so also with the Appropriation Ordinances of February 8, 1901, March 5, 1903, March 4, 1904, February 18, 1905, and March 26, 1905, all of which were introduced from pamphlets purporting on their face to be published by authority of the city council. We think they were properly proven.

We see no reason why, because the pamphlets containing other council proceedings besides the ordinances themselves, the ordinances themselves, which they contain, with the preface, ''The following is the ordinance as passed,'' are not in the language of the statute, ''printed in book and pamphlet form and purported to be published by authority of the city council.''

The objections, moreover, made to them were general and not specific.

We think, therefore, the questions in the case left to be decided by us are not complicated by objections to incidental procedure in the court below, but are to be solved from the record as it stands, and are the

City of Chicago v. Bullis.

primary and substantial ones indicated by the first errors assigned: First, does the proof show that the office filled by the appellee has been legally created? and second, does it show that he was legally appointed thereto? If these are answered in the affirmative, his right to the salary follows, and the ruling of the court that evidence of the appellee's earning or having the opportunity or capacity to earn during his enforced separation from his duties as a policeman, compensation for services rendered other parties, is immaterial. City of Chicago v. Luthardt, 191 Ill. 516, and cases therein cited, especially Andrews v. Portland, 79 Maine, 484.

That the distinction between an office and a mere employment is exactly this, so far as the right to compensation goes, is well settled and is practically conceded by counsel, who, however, insist that the position of a police patrolman is an employment and not an office. The contrary, we think, is the settled law. Chicago v. Luthardt, *supra*. Persons appointed police officers by a municipal corporation in any form, and especially under a law prescribing their tenure of office and protecting them from discharge, are not agents, servants or employes of the corporation. They are appointed by the corporation in obedience to the statute law of the state, to perform a public service not peculiarly local or corporate. The selection by the municipality has been deemed expedient by the legislature in the distribution of the powers of the government. They are not to be regarded as servants or agents of the corporation, but as public or state officers, with such powers and duties as the statute confers upon them. Dillon on Municipal Corporations, secs. 974 and 975, and cases therein cited. To hold otherwise would be to make the city responsible for the unlawful or negligent acts of its policemen—a very undesirable result for the appellant in this case.

But the appellant is right in its contention that to

entitle an officer, unlawfully removed or inhibited from his duties, to the emoluments which appertain to the office as an office, he must prove his legal right to the office—in other words, that he is an officer *de jure* and not merely *de facto*. That proposition is not only consistent with sound logic and right reason, but it has been often and recently expressly decided by our Supreme Court. Stott v. The City of Chicago, 205 Ill. 281; People ex rel. Kisselberg v. City of Chicago, 210 Ill. 479; McNeill v. City of Chicago, 212 Ill. 481; Moon v. Mayor, 214 Ill. 40; Kenneally v. City of Chicago, 220 Ill. 485. The court decided in these cases that to entitle one to recover the emoluments pertaining to an office as appurtenant to that office, and not as compensation for services actually performed, he must prove that the office existed and that he was lawfully appointed to it.

It also decided that in the cases before them one or the other of these matters necessary to the plaintiff's recovery had not been proven. But it did not, we think, intend in any of the cases to decide that there were no police officers *de jure* in the city of Chicago, nor that it was impossible to so plead and to so prove the case of one who was a *de jure* officer that the right to his official emoluments would be sustained. Nor do we think, despite an incidental remark in the Moon case *(supra),* that ''as explained in Stott v. City of Chicago, the office of policeman is not created by statute, but by municipal ordinances,'' it intended to foreclose the contention in subsequent cases where ''allegata and probata'' were complete and in proper shape, that by statutes relating to the city of Chicago *and* ordinances in pursuance of them, the office was created.

In the present case we cannot see where the plaintiff failed in his proof. He began by calling attention to the act of February 13, 1863, entitled *''An act* to reduce the charter of the city of Chicago and the several acts amendatory thereof into one act and to revise the same.''

Section 1 of chapter II of that act provides that the "officers of the corporation," other than the mayor and aldermen, shall be "a clerk, a comptroller, a board of public works" \* \* \* (many other named officers) "and as many bridge tenders, firemen, \* \* \* policemen, \* \* \* and such other officers and agents as may be provided for by this Act or the common council may from time to time direct."

Chapter X of the act treats of the "Police Department of the City of Chicago." The first section of that chapter establishes an executive department of the municipal government of Chicago, to be known as the Board of Police, and provides that the board shall consist of three commissioners and the mayor. The fourth section provides that said board shall assume and exercise the entire control of the police force of said city, and shall possess full power and authority over the police organization, appointments and discipline within said city. The fifth section defines the duties of the board of police in preserving the public peace; and the sixth section is:

"The duties of the police force shall be executed under the direction and control of said board and according to rules and regulations which it is hereby authorized to pass from time to time for the more proper government and discipline of its subordinate officers and the police force of said city. The said police force shall consist of a superintendent of police, three captains of police, six sergeants, *ninety police patrolmen, and as many more police patrolmen,* sergeants and deputy superintendents as may be authorized by the common council on the application of the board. *The said offices hereby created shall be severally filled by appointment in the mode prescribed by this Act,* and each person so appointed shall hold office only during such time as he shall faithfully observe and execute all the rules and regulation of the said Board, the laws of the state and the ordinances of the city."

February 16, 1865, an act was passed by the legislature, entitled "An Act to amend an Act entitled An Act to reduce the Charter of the City of Chicago, etc.,

approved February 13, 1863.'' Section 15 of that act reads:

, ''The duties of the police force shall be executed under the direction and control of said board and according to the rules and regulations which it is hereby authorized to pass, from time to time, for the more proper government and discipline of its subordinate officers and the police force of said City. The said force shall consist of a general superintendent of police, one deputy superintendent of police, three captains of police, sergeants of police not exceeding twelve, and as many police patrolmen not exceeding two hundred as may be authorized by the Common Council on the application of the board of police commissioners, and each patrolman so appointed shall hold office only during such time as he shall faithfully observe and execute all the rules and regulations of said board, the laws of the State and the ordinances of the City; Provided, that for incompetency, neglect of duty, or other sufficient cause, the said board may at any time remove the superintendent and deputy superintendent of police or the fire marshal and assistant marshals.''

It will be observed that with the exception of adding a deputy superintendent and increasing the sergeants to a possible twelve and limiting the patrolmen to a possible two hundred, the phraseology of this section 15 of the Act of 1865 does not materially differ from that of section 6 of chapter 10 of the Act of 1863. On the apparent ground that it covered fully the same subject, section 20 of the later act repeals, with other sections of the former act, section 6 of chapter 10. It is claimed by the appellant that because the words, ''The offices hereby created,'' are not found in the later act, it is shown that the legislature intended by the later act to reduce or alter the position of a patrolman from an ''office,'' if it had been so declared by the former act, to a mere employment. We do not assent to this. The legislature in its first act did create an office—as an office is defined in law; it made its

intention to do so cumulatively clear by incidentally alluding to it as an office then created. In the later act, which practically re-enacted the former act, with an increase in the number both of the classes and individuals in the police department, it adopted everything material in the former act but those numbers, and the formal repeal of the superseded act in no way detracted from the significance of the fact that in first describing the positions the legislature spoke of them as "offices." Indeed, where there is apparent no conflict or intention to supersede, a re-enactment of an earlier statute has been held a continuance, not a repeal, of the latter, even though the later act expressly repeals the earlier. Endlich on Interpretation of Statutes, sec. 490.

The next act of the legislature relating to the police force of Chicago was an act of March 9, 1867, entitled "An Act supplementary to an Act to reduce the Charter, etc., approved February 13, 1867, and the several amendments thereto." The provisions affecting the question here are these:

"Chapter 3, sections 1 and 2. The Board of Police, in their annual estimate of police expenses, made to the city comptroller; shall, if in their judgment the public weal require it, recommend to the Common Council such additional police patrolmen, and also such additional number of sergeants, not exceeding twenty, as may be necessary.

"The Common Council may, on such recommendation of said board, provide by ordinance for such increase of the patrol force; Provided, however, it shall require three-fourths of all the Aldermen elected to pass such ordinance. Such vote to be taken by ayes and nays and entered on the records of the Council."

In this act the legislature committed to the city council the determination of the number of occupants, without limit, of the office of "police patrolman," theretofore created by statute.

April 10, 1872, the legislature passed, and on April 23, 1875, the city of Chicago by election adopted, "An

Act to provide for the incorporation of Cities and Villages.''

We think that this act as passed and adopted by the electors of Chicago recognized the existence of the police officers of Chicago previously provided for by statute. *Certain* officers, it is declared by section 1 of article 6 of that act, shall be elected by the voters. Section 3 of said article provides that all officers, except where otherwise provided, shall be appointed by the mayor, by and with the advice and consent of the council. The act provides (section 11, chapter 1) that all ordinances in force when a city shall organize under the act shall continue in force, and that the organization shall not be construed to effect a change in the legal identity of such a city. It gives to the city council the right to regulate ''the police'' of the city and to prescribe the duties and powers of ''policemen.'' (Items 66 and 68 of section 1, article 5.) It says that ''policemen,'' among others, shall be conservators of the peace, and then gives the powers of ''all officers created conservators of the peace by this Act.''

It would seem that in Sheridan v. Colvin, 78 Ill. 237, the Supreme Court recognized the power of the council to vest the appointment of policemen in the head of the department, then the city marshal, even under this Act of 1872. But in any event, by the act to regulate the civil service of cities, passed March 20, 1895, and shortly afterward adopted by Chicago, the method of appointment provided for by the City and Village Act, if that required appointment by the mayor, was changed, for it was in the Civil Service Act provided (section 3) that the Civil Service Commissioners should classify all the offices and places of employment in the city, and (section 10) that the head of the department or office in which a classified position was to be filled should fill such place by the appointment of the person certified to him by the commissioners therefor.

There was then in existence an ordinance of the city

(which was introduced in evidence), passed June 28, 1875, creating an executive department of the municipal government of said city, to be known as the police department, and providing that the force should consist of one general superintendent of police, one deputy superintendent of police, four captains of police, twenty sergeants and the police patrolmen then in the employ of the city, which might be increased or decreased in number from time to time. The ordinance abolished the Board of Police, and was upheld as valid in Sheridan v. Colvin, *supra*.

The city marshal was made head of the department of police by that ordinance, as it would appear from the opinion in Sheridan v. Colvin, *supra*. That section, however, is not in evidence herein. The superintendent of police was expressly named and declared to be the head of the department in a subsequent ordinance. Revised Code of Chicago, as passed April 8, 1897, sec. 1478.

By various acts the legislature has, since the Act of February 13, 1863, before cited, recognized the state character of the office of "policemen in cities" (June 14, 1883), giving them special powers (May 13, 1887) outside of their own city, specifying necessary qualifications for "special policemen" (June 19, 1893), etc.

We think the statutes of the state have created, therefore, the office of policeman or police patrolman in the city of Chicago and recognized it since as so created. But however that may be, the operation of the statutes and the ordinances of the city of Chicago introduced here, together, have certainly had the effect of creating the office, and the ordinances and the action of the Civil Service Commission and of the superintendent of police have placed therein the plaintiff with a tenure of office which has not been interfered with except by the erroneous and canceled action of the Civil Service Commission.

The statute of March 9, 1867, hereinbefore quoted, allowed the common council to increase the number of

patrolmen, which had been by the Act of February 16, 1865, limited to 200. By ordinance of May 3, 1867, it did increase the number to 250; on August 23, 1869, to 325; on August 15, 1870, to 400, and from time to time thereafter, as the city grew, to a greater number.

In 1895 the Civil Service Act came into effect. Under it the commissioners placed the ''Police Service'' under Class A, ''Official Services,'' as distinguished from Classes B and C of ''Skilled Labor Service'' and ''Labor Service,'' respectively, and under the classification placed 2,504 patrolmen. Under that act also, in 1898, Walter Bullis was certified by the commission to the superintendent as eligible, and sworn in as a first class patrolman, in pursuance of said certification, reported back to the commission as appointed and sworn in by the superintendent of police, and continued to serve as patrolman, except for his unauthorized separation from his duties, until this suit was brought.

It is shown by the record that on February 8, 1901, the city council appropriated for the salaries of 2,500 patrolmen and that on January 5, 1903, by a vote of sixty-six to one it passed the following ordinance or order—for we do not agree with the contention of the defendant that this order differed from an ordinance:

''Ordered: That the superintendent of police be and he is hereby authorized to increase the number of police officers on the police force by filling vacancies wherever they exist and are necessary, the total number of officers on the force, however, after such increase is made, not to exceed the number authorized to be appointed under the appropriation budget of 1901.''

In 1903 the appropriation was made for 2,380 patrolmen; in 1904 for 2,306 patrolmen; in 1905 for 2,278; in 1906 for 2,196; while it is agreed that there were in fact in 1905 only 2,196 in service, and in 1906, 2,166.

We think the deduction can be made clearly from the evidence that in the years for which the plaintiff sues for the salary belonging to his office, he was *de jure* an officer and entitled to it, and that it was

appropriated for him but not paid to him by the city of Chicago.  Therefore the judgment of the Superior Court is affirmed.

*Affirmed.*